No. 632.—FAUSTIN BORDELON, Administrator, v. JOSEPH D. COCO et al.

A party having purchased property at probate sale during the war, cannot set up in defense to the payment of his obligations that the sale was made on the basis of the value of Confederate notes at the time of sale, and obtain a reduction of the price bid to that extent.

APPEAL from the Seventh Judicial District Court, parish of Avoyelles. *Lewis*, J. *Waddill & Barbin*, for plaintiff and appellant, *Cullom & Thorpe*, for defendants and appellees.

TALIAFERRO, J. The defendant Coco, at a probate sale of succession property of the estate of Jean P. Bordelon, in February, 1863, became the purchaser of a lot of hogs at the price of five hundred dollars, and in conformity with the terms of sale executed with the other defendants two promissory notes each for one-half the price, and payable respectively in one and two years from the day of sale, with interest at eight per cent. per annum from maturity of each note. In 1866 the plaintiff, as administrator, brought suit to enforce payment of these notes, and the defendant set up in his answer that the stock purchased was not worth more than one hundred dollars in gold; that Confederate money was the only currency used in this country, and that it was expected by all parties that these notes were to be paid in Confederate money, which was then worth only twenty cents on the dollar. The judge of the lower court gave judgment for $125 in gold, or its equivalent in current funds, with interest, etc. From this judgment the plaintiff has appealed. There is error in the judgment, in this, that it recognizes the right of the parties to deal in and, consequently, give credit to an unlawful paper currency. It assumes that they contracted with especial reference to the discharge of the debt by the payment of this illicit paper issue, and thence proceeds to ascertain the value in gold, at the time of the contract, of five hundred dollars of that currency and finds the correlative value to be $125. This is not in express terms rendering

judgment for the payment of five hundred dollars in Confederate paper money, but it is in substance the same thing. If the parties contracted, the one to pay and the other to receive the debt in question in that issue, as the judge *a quo* by his judgment determines they did, the contract was null *ab initio* and the suit shoul l have been dismissed. This should have been done if such were found to be the case; if not, judgment should have been rendered for the whole amount. We find no such array of facts in this record as leaves no reasonable doubt upon the mind that the parties contracted with reference to payment in the so-called Confederate money. There is nothing to warrant the conclusion that the administrator, acting as he did in a fiduciary capacity, agreed with the defendant to receive payment in that currency. The terms of sale were fixed by the advice of a family meeting, and they certainly gave no authority to the administrator to receive payment for the minors' property in a worthless and constantly depreciating currency. If, as a witness stated, the administrator did on one occasion receive in payment a small sum under the cash limit, in paper of that character, it was at his own risk, as he was without authority to do so. There was no declaration made at the sale nor any intimation whatever given that the currency in question would be received in payment of the property of the succession. It may be reasonably supposed that the parties acting in behalf of minor children looked through the vista of two years and saw in the distance the final explosion of the paper currency then in vogue, and in which even then all confidence was lost. One witness swore that in 1863 there was gold and silver in the country; that cotton was bought with gold, and that he refused to take Confederate money in payment of debts contracted before the war.

The defendant executed his two promissory notes in conformity with the terms of sale, and bound himself to pay five hundred dollars to the estate in one and two years. If he bound himself under the belief that he was to discharge his obligation by the payment of valueless currency he wronged himself. There is nothing we find in the record that justified him in that belief.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be annulled avoided and reversed. It is further ordered that the plaintiff have judgment against the defendants *in solido* for five hundred dollars with interest on one-half of that sum at eight per cent. per annum from the thirtieth day of March, A. D. 1864, and like rate of interest on the other half from the thirtieth day of March A. D. 1865. The defendants to pay all costs of suit.

No. 613.—Francois Arceneaux et al. v. St. Clair de Benoit et al.

The several acts of the Legislature passed in 1864, 1865 and 1866, providing for the return of appeals to the Supreme Court, were enacted in the liberal spirit of reinstating the right of appeal in all cases in which it had been lost or suspended by the disorganization of the courts and the utter confusion and derangement of judicial proceedings consequent upon a state of war. These statutes should be construed liberally.

Appeals granted since the first of September, 1860, and filed at the proper places of return, on or before the return day for such appeals, are in time, although the return be made subsequent to the first Monday of March, 1866, to which time the right of appeal had been extended by the act of December, 1865. The act of March 22, 1866, is, in its spirit, an extension of the time beyond the first Monday of March, 1866.

A survey under the Spanish Government, when Louisiana was a province of that Kingdom, not made in conformity with the forms and requirement of the order, and never approved or confirmed by the Spanish authorities, is merely an inchoate title. The land embraced by such survey passed by the treaty of cession to the United States as part of the public domain, the title to which vested in the new sovereign.

Where a party having such inchoate title, with partial confirmation by the United States Government, and in order to obtain a further concession under his claim, enters into an agreement with contiguous proprietors by which they renounce their right to back concessions under the acts of Congress of 1811 and 1826, and he recognizes the full extent of their claims, he is estopped thereby, in an adjustment of boundary, from claiming limits which would conflict with those of the other party, under the pretense that his claim, under the original order of survey, has been fully confirmed by the United States.

The action of boundary cannot be prescribed against. Civil Code, article 821.

APPEAL from the Eighth Judicial District Court, parish of Lafeyette. Martel, J. M. E. Girard, for plaintiffs and appellees. Gary & Fournet and DeBlanc & Perry, for defendants and appellants.

Taliaferro, J. In this case there is a motion to dismiss the appeal on the ground that it was not brought up in accordance with the provisions of the acts of the Legislature directing the manner of returning certain appeals; one of which acts was passed in 1864, and the other in December, 1865. By the act of 1864 it was provided that all appeals should be returned to the Supreme Court at New Orleans. The act of December, 1865, directs that in all cases in which appeals have been granted from judgments of the District Courts of this State, at any time since the first day of September, 1860, the appellants are granted until the first Monday of March, 1866.

The point made by the appellees is that the appeal in this case having been granted on the twenty-ninth of September 1860, and the transcript not having been filed at the proper place for returning the appeal, on or previous to the first Monday of March, 1866, the appeal is barred. It is contended that the act of December, 1865, was specially enacted, extending the time for bringing up appeals, and the appellants not having availed themselves of the act cannot now prosecute their appeal.

In reply to this it is urged that by a subsequent law, the act of the Legislature of March 22, 1866, the time granted by the former laws was extended. That act provides that "all appeals which have been taken since the first of June, 1860, from the District Courts of this State and which are now pending and which have not been finally

85

determined on their merits shall be heard and determined by preference, at the places designated by existing laws, provided, the records be filed on or before the next return day after the passage of this act."

We think a proper interpretation of these several acts authorizes the conclusion that the purpose of the law maker was, by liberal provisions, to reinstate the right of appeal in all cases in which it had been lost or suspended by the disorganization of the courts and the utter confusion and derangement of judicial proceeding resulting from war in the country.

The construction of the acts of 1864 and 1865, contended for by the appellees, we think too stringent and not in unison with the spirit of the legislation on the subject. We are inclined to regard the act of 1866 as an extension of the time for bringing up appeals, and we find that the transcript of appeal in this case was filed within the time allowed by the act.

The motion to dismiss is therefore overruled.

Coming to the merits of the case we find it to be an action of boundary, involving from its character, to some extent, questions of title.

The plaintiffs allege that they are the owners of several contiguous tracts of land which they designate by numbers and display their relative position in respect to the defendants' lands by maps and diagrams. They represent them as lying in township No. 8, south of range No. 5, east, in the southwest land district of the State, and bounded on the west by the Bayou Vermilion, extending eastwardly from the bayou the depth of forty arpents, where their several tracts are bounded by the contiguous lands of the defendants, lying east of their back lines. They allege their titles to these lands to be derived from regular confirmations by the United States government of Spanish grants. The answer is a general denial and an averment of ownership of the lands in question. The defendants plead the prescription of ten, twenty and thirty years. They claim under an order of survey granted by Governor Miro to Madame Louise de Favrot on the seventeenth of March, 1790. In the year 1772, the Spanish government granted to Joseph Alexander Declouet a tract of land extending by diverging lines across the Bayou Têche forty arpents deep in a westwardly direction toward the Bayou Vermilion. In September, 1789, after the death of the Chevalier Declouet, his widow, Louise de Favrot, petitioned the government for a back concession to the original grant, claiming an extension of the former tract forty arpents to the Bayou Vermilion. We have already noticed the order granted by Governor Miro upon this petition. The order was executed by Gonsoulin, who appears to have been a surveyor of that time, on the twenty-fourth of April, 1796. This order of survey, it appears, was never returned or approved by the Spanish authorities. It seems never to have been proceeded with further than the location made by Gonsoulin. The title of the Spanish

government was never divested, and consequently it passed by the treaty of cession to the United States as part of the public domain. The title under the order of survey was only inchoate and imperfect and subject to the future action of the new sovereign. 4 An. 99; 7 An. 546; 11 An. 142. In 1811 the United States confirmed a part only of this claim, viz: Sixteen hundred arpents bounded by parallel lines. Of the disposition made of the remainder we shall speak further on.

The titles of the several plaintiffs are based on grants by the Spanish Government in 1781, with regular confirmations by the Board of Land Commissioners in 1811. These confirmations are for forty arpents in depth on each side of the Vermilion, the extent of the front lines varying. These several tracts, nine in number, lie contiguous to each other, and by a survey made about the year 1854, and approved by the Surveyor General of Louisiana, are shown to run back eastwardly from the Vermilion forty arpents. By this plot of survey introduced in evidence no confliction of these tracts is shown with other lands. It is however certain from the evidence, that if the survey of the back concession of Mrs. Favrot be extended forty arpents westwardly from the original grant to Declouet on the Têche, it must inevitably conflict with the surveys running eastwardly forty arpents from the Vermilion. It is this confliction of these claims, if both are extended their full depth, that forms the gist of this controversy.

The defendants undertake to show that this difficulty has long since been settled by the ancestors of the present litigants. They show a formal notarial act executed on the sixteenth of February, 1802, before Louis Charles DeBlanc, civil and military commandant of the post of Attakapas, to which Alexander Declouet was a party on the one side, and Louis, Pierre, Alexander and François Arceneaux, Francis Carmouche, Joseph Breaux and Jean Guilbeau were parties on the other side. By this act the parties agreed to establish a division line to be marked by indicia of a permanent character, and obviate for the future all cause of dissension on the subject of their boundaries. The last named parties acknowledged that on the east side of the Vermilion their claims "would reach and extend on the lands of Declouet." Along the division line agreed upon, roads were to be opened through the swamp, and mounds of earth were to be thrown up. At that time no surveys had been made of the several tracts claimed by the Arceneaux and others, but it seems that the back line of the Declouet claim would have reached to within about fourteen arpents of the Vermilion. The surveyor, who, under an order of court pending this suit in the lower court, made a survey, found no certain traces or remains of this boundary line established by the act aforesaid; but several witnesses testified to the existence of two or three mounds in the vicinity of the supposed location of the line of division. Upon the inventories of the estates of François, Pierre and Toussaint Arceneaux, tracts of land

are described as having fronts on the east side of the Vermilion and running *fourteen* arpents in depth.   There is little room to doubt that there was a division line established between the parties as the notarial act purports, and that it was placed at the distance of about fourteen arpents from the Vermilion.

We shall now revert to the final action of the United States Government upon the back concession of Mrs. Favrot and to the position of the parties at that time.   After having accorded to them after the change of government, by virtue of this incomplete title from the Spanish government, sixteen hundred arpents of land, the heirs of Mrs. Favrot again made application for a further confirmation under this claim, and upon it a favorable report was made to the Secretary of the Treasury by the Register of the Land Office at Opelousas, on the first of October, 1825.   Register's Report A, No. 63.   The claim was confirmed by act of Congress on the sixteenth of May, 1826.   A plot accompanies the report showing the relative position of the back concession to Mrs. Favrot and the lands of the plaintiffs.   The direction in which the back line of the Favrot concession would cross the several tracts of the plaintiffs is shown by dotted lines.   Other lines shaded in blue indicate two portions of the area embraced by the lines of the back concession, and which touch, but do not conflict with any of the plaintiffs' lands.   One of these portions contains 715.06 acres, the other 235.60 acres, making together 974.04 acres.

In 1820, the heirs of Mrs. Favrot procured from the then owners of the several tracts belonging now to plaintiffs a renunciation of their rights to the back concession to their lands, accorded by law of Congress in 1811, and extended in 1820.   And this renunciation was shown in their application reported upon by the Register first of October, 1825, and is recited in the report.   It is in these words: "We, the undersigned persons whose lands front on the Bayou Vermilion and extend in depth to the lands belonging to the legal representatives of the late Madame Louise Favrot, widow of Mr. Alexander Chevaleur Declouet, do hereby renounce expressly all right of preference whatever which we might have under the pre-emption law of 1811, which has been revived by the act of Congress of the eleventh May of the present year; it being well understood by us and the neighbors in general that the lands back of our respective tracts was, or ought to have been embraced in the concession made by Governor Miro to the said widow, of the second depth of the land which has been granted to her husband.   For which reason we think it but just that the government of the United States do confirm the said heirs, etc., in their right and title to the said land, and we ask permission to recommend the renewal of the confirmation to them of the title to the vacant land lying south of the land of Mr. Jean Gilleau, and between the back lines of the land of the said heirs and the left bank of the Bayou Vermilion as an equiva-

lent for the interference of our lands with those of the said representatives, as set forth in the plot. Parish of St. Landry, twenty-eighth December, 1820." [Here follow the signatures of the parties.]

The report also recites that the Favrot heirs "expressly disclaimed any intention or wish to disturb their neighbors in their possessions, and therefore have confined their claim to those parts represented in the said plot by the lines shaded with blue."

The land claimed in the application for confirmation was represented as containing "about nine hundred and twenty superficial acres, American measure." This is less than the contents of the two portions of the area of the front concession before referred to, by 54.04 acres.

The plaintiffs hold that these acts of the defendants conclude them against any further claim under the order of survey granted in 1790 by Governor Miro as a back concession to Mrs. Favrot; that they have acknowledged the plaintiffs' claims, to their full extent, by obtaining the plaintiffs' renunciation, in 1820, of their right of pre-emption to their back lands—a renunciation made for the benefit of the defendants—and by limiting their claims to the lands represented on the map by the lines shaded with blue. They further contend that the defendants, by the act of Congress of sixteenth May, 1826, have been accorded all the land they prayed for, and should not be allowed now to claim, by a third extension of the old order of survey, an additional quantity of more than a thousand acres to be taken from the lands of the plaintiffs. A retrospect of the attitude and claims of the parties may now not be out of place. And first we will look at the order of Governor Miro of seventeenth March, 1790. That order is as follows:

"NEW ORLEANS, March 17, 1790.

"The surveyor of this province, Don Carlos Lareau Trudeau, will establish the party upon the second depth of land which is solicited and described in the widow's memorial, it being well understood that the second depth shall not exceed forty arpents, being vacant and not causing any prejudice to the neighbors, he will extend his proceedings in continuation hereof, signing the same with the aforesaid neighbors, and he will remit the same to me in order to provide the person interested with a title in form.

(Signed) ESTEVAN MIRO."

This order is clear and explicit. It contains conditions that the lands to be surveyed shall be vacant, and that the survey shall cause no prejudice to the neighbors. The grants to the plaintiffs' ancestors were made in 1781, nine years before the above order of Governor Miro. It is not shown that the plaintiff's lands were surveyed at that time, nor that they might not have been located elsewhere on the Vermilion. The recommendation indorsed upon Madame Favrot's petition states that the adjoining lands, except the front, belonged to the king's do-

main. The survey of Gonsclin was not made until April, 1796. Six years afterward the parties entered into the compromise before the notary.

In the absence of anything shown to the contrary it is not unfair to presume that these grants had a fixed place for their location. At all events Declouet recognized them, and the *Locus in quo* was not questioned or disputed. It may then be a matter of some doubt whether the location of the back concession was made upon vacant land or " without prejudice to the neighbors." However this may be it is not now important to inquire, as the claimants of the lands on the Vermilion waived and yielded a portion of their lands in order to preserve peace and amicable relations with, as it may possibly have been, their more wealthy and influential neighbor. It is worthy of note the manner in which the United States government has dealt with this order of survey. It seems to have carried out, in every respect, the conditions fixed by Governor Miro. The original order does not direct the extension of the diverging lines, a rather unusual mode, under the the Spanish Government, of locating surveys. The order declares that the second depth shall not exceed forty arpents. The confirmation of the sixteen hundred arpents in 1811 gave that quantity within parallel lines, although in the rhomboidal form.

Next we see that the report of the Register's No. 63, letter A, shows a disclaimer on the part of the applicants to disturb other parties or interfere with their limits, and also to show a formal renunciation by the persons having adjacent lands, their right to enter their back lands, by preference. The quantity, represented to be about nine hundred and twenty acres, was thus, as it clearly appears, confirmed by the act of Congress of May, 1826, under the belief and intention that the confirmation was to injure or interfere with the rights of no other person.

The lots or sections numbered 44 and 108, and marked " Louise De Favrot, Register's Report A, 63," on the map marked J, introduced in evidence, gives the quantity of land claimed under the application forming the subject of that report, and leaves entire and free from confliction the lands of the plaintiffs.

We think the law and equity of the case are with the plaintiffs, and that the defendants, from the course they have pursued in pressing a second confirmation upon the Government, have estopped themselves from claiming any portion of the plaintiffs' lands under the order of survey. This being an action of boundary, the plea of prescription does not apply. The judgment of the lower court, with some amendments in the designation of boundary, should be affirmed.

It is therefore ordered, adjudged and decreed that the boundary between the lands of the parties be and the same is hereby established as follows, to wit: Beginning on the Bayou Vermilion at the southwest

corner of the tract of Jean Gilbeau, and running thence southeast-wardly along the lower side line of said tract to the extremity of said line the depth of forty arpents more or less; and thence northwardly following around the end lines successively of the several contiguous tracts as shown by the line shaded with blue, to the point where the said line intersects the upper or northern side line of the tract of Joseph Breaux at the northeast corner of said tract; and thence westwardly along said side line to its extremity on the Bayou Ver-milion. The lines, corners, etc., here designated, are given as the same appear upon the map marked J, introduced in evidence in the case.

It is further ordered that the defendants pay costs in both courts and it is further ordered that the judgment of the lower court, as thus amended, be affirmed.