No. 9925
Orleans

---

## WILSON v. LYON LUMBER CO.

---

(June 20, 1927. Opinion and Decree.)
(October 3, 1927. Rehearing Refused.)

---

(*Syllabus by the Court*)

1. Louisiana Digest—Master and Servant —Par. 160 g; Minors—Par. 10.
No prescription runs against the minor claiming under the Employers' Liability Act No. 20 of 1914 as amended, so long as such minor is unprovided with a tutor.

2. Louisiana Digest—Pleading—Par. 63; Master and Servant—Par. 160 i.
A plea of prescription will not be noticed unless it is specially and specifically made.

3. Louisiana Digest — Minors—Par. 177; Master and Servant—Par. 160 e.
None but the tutor can act judicially for the minor.

4. Louisiana Digest—Emancipation—Par. 3.
A decree of emancipation cannot be attacked collaterally.

5. Louisiana Digest—Master and Servant —Par. 160 j.
When the plaintiff, "a well-developed and nourished negro male," falls upon his hip from an elevation of fifteen feet upon an iron truck and then suffers from arthritis of the hip, the conclusion is that the cause of the arthritis is the fall, in the absence of any other cause.

(The recent amendment of Act 20 of 1914 is Act 85 of 1926.—Editor's note.)

Appeal from Twenty-eighth Judicial District Court for the Parish of St. John the Baptist. Hon. Prentice E. Edrington, Judge.

Action by Eddie Wilson against Lyon Lumber Co.

There was judgment for plaintiff and defendant appealed.

Judgment amended.

J. V. Chenet, of New Orleans, attorney for plaintiff, appellee.

Leslie P. Beard, of New Orleans, attorney for defendant, appellant.

·CLAIBORNE, J. This is a suit for compensation under the Employers' Liability Act.

The plaintiff alleged that he was a minor fully emancipated by judgment dated June 12, 1922. This suit was filed December 23, 1922.

The injury was suffered September 20, 1920. The defendant pleaded the prescription of one and two years. The petition for emancipation alleged that plaintiff was a natural child not provided with a tutor. A special tutor appointed to him consented to his emancipation.

The plea of prescription is based upon Section 31 of Act 20 of 1914, p. 60. It reads:

"That in case of personal injury (including death resulting therefrom) all claims for payments shall be forever barred unless within one year after the injury or death the parties shall have agreed upon the payment to be made under this Act, or unless within one year after the injury proceedings have been begun as provided in Sections 17 and 18 of this Act. Where, however, such payments have been made in any case, said limitations shall not take effect until the expiration of one year from the time (of) making the last payment."

But Section XVI of Act 20 of 1914, p. 56, provides:

"No limitation of time, in this act provided for, shall run, so long as such incompetent or minor has no curator or tutor as the case may be."

This clause has been re-enacted in the amending Act 38 of 1918, p. 58.

We conclude, therefore, that prescription was suspended during the minority of the plaintiff and until he was emancipated.

Defendants' attorney in his argument and in his brief relies upon the prescription of fifteen days and six months established by Section 11 of the Act of 1914, as amended by Act 243 of 1916, p. 517. But this prescription was not pleaded and defendant cannot avail itself of it. The particular prescription relied on must be specially pleaded, or it will not be considered.

"Although the note may on its face be prescribed by five years if the plea of four years be set up it will not be maintained." Allot vs. Aubert, 20 La. Ann. 510; Mansfield vs. Doherty, 21 La. Ann. 395; Arceneaux vs. Benoit, 21 La. Ann. 676; Gaines vs. Succession of Del Campo, 30 La. Ann. 246; 6 La. Dig. 33, S. 63, p. 205; S. 218, 207, 219.

It is also argued that plaintiff, having been informally adopted by Lottie Wilson, wife of Anderson King, since his infancy, they had the legal right to act for him in court and otherwise so as to interrupt prescription. The reverse has been decided in Mayes vs. Smith, 11 Rob. 503, wherein it was said:

"A judgment would not be res judicata as to the minor, unless represented by a duly qualified tutor. Nor would the defect be cured by suing in his name assisted by his father."

The defendants further alleged "that the decree of emancipation of the plaintiff was irregular and not according to law because in the emancipation proceedings appeared the consent of one Lottie King who represented herself as the 'adoptive' mother of plaintiff and on the trial of the cause the said person who appeared in said emancipation proceedings for the purpose of giving her consent and complying with the requisites of the Revised Civil Code, denied relationship in any degree with plaintiff".

The answer to that objection is that the judgment of emancipation makes full proof until set aside by appeal or action of nullity. 1 H. D. 583, No. 4, 1462; Hoover vs. Sellers, 5 La. Ann. 182; Thibodaux vs. Thibodaux, 5 La. Ann. 598; Duson vs. Dupree, 32 La. Ann. 896; Beauregard vs. Lampton, 32 La. Ann. 827.

A judgment emancipating a minor cannot be attacked collaterally. Johnson vs. Alden, 15 La. Ann. 505.

The plaintiff alleged that the defendant owed him the amount allowed by the Employers' Liability Law on account of a physical injury sustained by him as a workman for said company; that the defendant is engaged in the sawmill business, being a hazardous occupation; that on September 20, 1920, plaintiff was employed by said company and while working he was standing on an overhead joist disentangling boards on a chain carrier installed over two adjoining joists about four feet apart, when his foot slipped and he fell down from an elevation of fifteen feet upon his left hip upon the iron bar of an iron truck about one foot high on a plank floor beneath; that he suffered a severe injury of his left hip joint which physicians at the Charity Hospital have diagnosed as a traumatic arthritis of the left hip; that immediately after his fall and under directions of Mr. Prescott, defendant's foreman, plaintiff was taken for medical attention to the local office of defendant's physicians, who prescribed some liniment to rub his hip; that plaintiff remained in bed for a week when he was advised by defendant's physician not to lie down but to go back to work; that plaintiff tried to work for a short time but had to quit; that he remained under the treatment of said doctor for over a year when he was advised that he had rheumatism; that he consulted Dr. Donaldson, who advised him that he was suffering from an injury of the hip; that he next consulted Dr. James Pearce under whose advice he went to the Charity Hospital in New Orleans on March 26, 1922; that the physicians there diagnosed his case as "traumatic arthritis of the hip", that is an injury resulting from some violence; that his leg was put in a splint of plaster of Paris which he is wearing to this day; that "he has been and is still unable to work and that his said injury has produced a temporary total disability to do work of a reasonable character"; that his contract of hiring with the defendant was under the operation of Act No. 20 of 1914, as amended, commonly known as the Employers' Liability Law; that at the time of his injury plaintiff was earning $3 a day or $18 a week of six days; that under Section 8, Paragraph 1 (a), of Act 247 of 1920, amending the Act of 1914, the defendant owes plaintiff sixty per cent of said wages from September 20, 1920, during the period of his disability not exceeding 300 weeks; that the defendant also owes him $74.92 amount of fees paid to Doctors Donaldson and Pearce, and drugs and transportation to Charity Hospital.

For answer the defendant admitted that it was a corporation engaged in the sawmill business; but denied all the other allegations of the petition, even plaintiff's falling as alleged.

In a supplemental petition the plaintiff alleged that since the filing of his petition he is advised that his injury has produced a shortening of his hip and total permanent disability to do work of any reasonable character and that he is entitled to compensation for 400 weeks instead of 300.

Defendant excepted to the filing of this supplemental petition on the ground that it was filed too late after issue joined and after testimony of a witness for plaintiff had already been taken.

The plea of prescription was overruled, and there was judgment in favor of plaintiff for sixty per cent of his weekly wages or $10.80 per week for 400 weeks, subject to a credit of $367.36 and for $74.92 for medical services and drugs.

The defendant has appealed.

The facts of this case as stated by plaintiff and his witnesses are as follows:

The plaintiff, Eddie Wilson, was the son of Daniel Riely and Adeline Dorsey; was born in Lutcher, Louisiana, in 1903 or 1904; his mother died when he was three months of age and he was adopted informally by his stepmother, Lottie Wilson, now wife of Anderson King, and went to live with her in Garyville, Parish of St. John the Baptist; he began to work for the defendant company when he was about fifteen years old laying strips in the stackers; September 20, 1920, he was working on a chain carrier that carries lumber to the stackers on an upper floor about fifteen feet from the ground floor; the upper floor was an open scaffold with joists about four feet apart with a chain running on it; he slipped through the joists and fell to the ground floor, his left hip striking an iron truck about twelve inches high; that was about fifteen minutes after five in the evening; two of the workmen, Sam Thompson and Sam Lawes, came to his assistance, lifted him up, supported him on their arms, and carried him to the office of Dr. Murphy, regular physician for the defendant, the Lyons Lumber Co., with Dr. Parker; the doctors put sticking plaster upon him; the two workmen then brought him home and put him to bed; he remained in bed about a week; he then returned to the doctor's and complained that his hip was hurting him; the doctor gave him a bottle of liniment to rub his hip; the next day he returned to the doctor's, who passed a "shocking" machine over his hip; he walked around with a stick for about two weeks; and lay in bed for about three weeks when he called on the doctor again; the doctor told him he had rheumatism in his hip, and to go back to work, and not to walk with a stick, for if he remained quiet his hip "would draw up";

he tried to work and made one week and his hip did not feel better; he went back to Dr. Murphy who passed the "shocking" machine over his hip again; the doctor told him again that he had rheumatism and that his blood was "dirty" and he needed some "shots", and three "shots" would cost $30; he had no money and he tried to go back to work but he was not able; he made one or two days a week; he bought a bottle of the famous prescription and took ten bottles at $1.04 a bottle, but he felt no better; one morning as he was going to work Mr. Prescott caught up with him; Mr. Prescott is foreman for the defendant; he said to plaintiff that he would arrange to send him to the Baton Rouge Hospital; Mr. Prescott opened an account for him at the drug store and "sent a straw boss" for him to get his medicine there; that was in November, 1921; about November or December, 1921, he got so weak he could not work any more; so he sent his stepmother to Mr. Prescott to see about sending him to the hospital; he told her to see Mr. Weicks, the company's treasurer; Mr. Weicks said he would send the company's doctor to see him and that if the doctor said his sickness was caused by the fall that they would send him to the hospital; they sent to him Dr. Parker, who examined him and said he had "tubercular rheumatism in the hip"; he remained under the treatment of the company's doctors for about a year, and when he felt no better and got down to bed, he sent for Dr. Donaldson, who treated him three months; Dr. Donaldson did him no good, so he called in Dr. Pierce, colored, from Lutcher, who made one visit; Dr. Pierce told him his medicine would not "reach his misery", his hip was hurt and to go to the Charity Hospital in New Orleans; he went there on March 26, 1922; they took an X-ray picture of his hip, and

on April 15 they put a plaster of Paris all around his waist; he stayed in the hospital in bed up to May 26; after that he went home with the plaster on and stayed six weeks; he returned to the hospital, where they took off the plaster and put another one on; he returned home, and after another six weeks he went back to the hospital, where they took off the plaster and put on a third one shorter and looser; they took the last plaster off on December 13; his leg did not then hurt him any more; but he could not use it any longer as it was stiff.

Dr. Theodore O'Ferrell and Dr. Simon put the plaster on; he saw the former two months ago; he told plaintiff to come back; that his hip was getting along all right, but that he would never be able to use it any more as before; plaintiff was always strong and healthy before his fall; his wages up to that date were three dollars a day and six days a week; at present he has no pains in the hip, but he cannot stand a long time; when he went back to work at the mill after his fall he worked one or two days a week; his hip hurt him so much he could not work; since his fall he has not been able to do any work of a reasonable character because his hip is stiff, and he cannot stoop down to the left foot and he cannot stand on his leg too long because it gives way; he lives in New Orleans since September, 1923, with his brother; he never had any venereal disease; since December 15, 1923, he has found work cleaning up a drug store at $8 a week; when he worked for the defendant after the accident he got $1.50 a day.

The plaintiff identified a certificate dated June 1, 1922, signed by Dr. Parker, physician for the defendant company, addressed to the Unity Industrial Life Insurance Association, reading partially as follows:

"Name of member: Ed Wilson.
"10 Nature of injury or accident: Prob. dislocation of hip.
"11 Date injury was received: Sept. 20, 1920.
"12 How was it sustained? Fell from scaffold.
"13 What external evidence is there of of injury? Loss of function.
"14 Is disability now total or partial? Total.
"15 In your opinion how long should disability continue from this date? Few weeks.
Signed: "MURPHY AND PARKER."

Sam Thompson, one of the two workmen who picked up the plaintiff, corroborates the plaintiff up to the time he helped to carry the plaintiff to Dr. Murphy's office.

Sam Lawes, the other workman, corroborates the plaintiff up to the same time.

Anderson King, husband of Lottie Wilson, corroborates plaintiff as to his birth, his age, his informal adoption by Lottie Wilson, his fall, his visit to the doctors, their advice to plaintiff to work, the plaintiff's visit to Dr. Donaldson, whose opinion was that plaintiff was not suffering from tubercular rheumatism; he took the plaintiff to the Charity Hospital; the opinion of the doctors there that plaintiff's hip was injured by a fall; that it was not tubercular rheumatism; the putting of plaintiff in plaster three times; that he was in bed at the Charity Hospital; the doctors at the hospital were O'Ferrell and Simon.

Lottie Wilson, wife of Anderson King, corroborates plaintiff and her husband; the injury to plaintiff, his sickness, suffering; his consultations with Drs. Murphy and Parker and Donaldson and Pierce and their advice; the plaster upon his hip and leg.

Dr. H. Theodore Simon is a licensed physician, a graduate of Tulane Medical

School, visiting orthopedic surgeon of the New Orleans Dispensary and chief orthopedist of the Presbyterian Hospital in cooperation with Dr. J. T. O'Ferrell; orthopedy is a specialty of diseases of the bones and joints; he treated the plaintiff at the Charity Hospital from the latter part of March, 1922, up to the present time, January 20, 1923; Eddie Wilson complained of pains and stiffness in the left leg; he said that while he was working in a sawmill he had fallen; he diagnosed the case from what Wilson told him and by the aid of physical examination; Dr. O'Ferrell did also; they were of the opinion that there was an inflammation or arthritis of the left hip; an X-ray of the hip was made which showed evidence of an area of absorption of the head of the femur and the corresponding acetabulum; from these points a diagnosis of traumatic arthritis of the left hip was made; traumatic arthritis means an inflammation of a joint due to trauma or injury; the injury must necessarily be of a fairly sufficient violent means to produce inflammation of the joint; a Wasserman blood test was made which was negative; in other words, there was no evidence of syphilis; then the hip was put in a solid plaster of Paris preventing any motion; at the end of six or eight weeks the plaster was removed and another similar cast was put on; three changes of cast were made; two or three weeks ago the plaintiff returned; the plaster was removed; there was no pain in the hip; but there was no motion in the joint; he applied an X-ray and found the areas of destruction still existing and evidence of ankylosis or boney union in the joint; he did not then have the free use of his leg and hip as he did prior to the injury; there was pain when the plaster was removed; ankylosis means an absolute loss of motion in the joint, and is permanent; in other words, he knows that

the plaintiff will never have motion in this joint; assuming that it is true that the plaintiff fell, as he states, from an elevation of fifteen feet upon an iron truck upon the floor, he concludes that his illness was caused by the fall; if prior to the fall the plaintiff had been healthy and no other cause was assigned for his condition, it would be an absolute certainty that his trouble was due to the fall in the absence of any other cause being assigned; what he said was clear to him, owing to the destruction of the cartilaginous surface the head of the femur is no longer free to move in its socket; the symptoms existing in the plaintiff would become apparent a few hours after the trauma or after several months depending upon the amount of inflammation or destruction, and would continue until proper treatment was administered; the condition would not be aggravated by the fact that the injured person had suffered from a venereal disease, the symptoms would be different and the X-ray findings would be different; he is aware that plaintiff had been afflicted with gonorrhea; it is of no importance in this case; a person suffering from traumatic arthritis could not do hard work if the symptoms had developed to such an extent as to cause severe pain; after the Wasserman test it was found that the blood was all right and free from syphilis.

Dr. John F. O'Ferrell has been practicing sixteen years, is a graduate of Tulane University and is chief of the Orthopedic Surgical Service of the Charity Hospital; in that capacity he examined the plaintiff; he had a traumatic arthritis of the left hip, which means an inflammation of the joint produced by a blow; supposing that the plaintiff fell from an elevation of fifteen feet upon an iron truck below, he would say that that was the cause of the condition of his hip; he had no reason

to doubt plaintiff's statement; he found no other cause for the diseased condition of plaintiff's hip; Dr. H. T. Simon was his assistant; they made a Wasserman test and it was negative; the report of the Charity Hospital dated May 22, 1922, signed by Dr. Wm. W. Leake, Superintendent, contains a correct record of his examination of plaintiff made jointly with one of the assistants of his staff; he found no syphilitic trouble that could have been the cause of the disease of plaintiff's joint; luetic or syphilitic means the same thing, infection; that Wasserman test determined that there was no luetic or syphilitic infection; plaintiff was under his treatment from March, 1922, to May, 1922; during that time he saw plaintiff a number of times and some one in his service saw him every day or two; he applied the plaster himself and his assistant, Dr. Simon, applied a couple of plaster casts; the plaintiff had no rheumatism; all reputable surgeons avoid the term "rheumatism" because that has no real meaning as applied to disease; nowadays they try to be more specific nd speak of arthritis, because it refers definitely to an inflammation of the joint; he examined the plaintiff about thirty days ago; his present condition is a permanent injury; he is not able to do any work of a reasonable character as a laborer because he has this limitation of the motion of his hip; there is no such thing as gonorrheal arthritis; the clinical manifestations are entirely different from the type of arthritis seen in plaintiff.

The Charity Hospital report spoken of by Dr. O'Ferrell is partly as follows:

"Name    Eddie Wilson.
"Admitted:    3-26-22.
"Discharged:    5-22-22.
"Diagnosis:    Arthritis left hip. Traumatic. Physician: O'Ferrell. Complaint: Sore hip. Negative for syphilis. Gonorrhea about one and one-half years ago; one

year ago last September had a fall on his left hip and ever since then he has had trouble with hip; it aches all the time, a dull aching pain; pain worse in cloudy and bad weather; cannot bear any weight on his leg; well-developed and nourished negro male; head and neck negative, heart regular, no enlargement and no murmur; lungs negative; abdomen negative; left hip appears to be some swollen; pain on pressure over acetabulum; pain on fixing the hip; joint is movable, but cannot bear any weight on it.    X-ray report: Skiagraph shows slight irregularity of inferior border of acetabulum and head, probably due to traumatic arthritis; no destruction; Wasserman test, negative. Report of consultant: This case appears to be an arthritis of the left hip, probably luetic; fixation of plaster is indicated recommended for Wassermann of blood; case transferred to orthopedic service.
"Signed:    WM. W. LEAKE, M.D.,
"Superintendent."

Carroll G. Delery testified that he kept a store in Garyville; that since he heard plaintiff had a fall he saw him "limping, pulling on one leg", sometimes he walked with a stick, at other times without; plaintiff lives a few acres from the store.

Lottie King said that the plaintiff was not able to do any hard work at all; he cannot even put on his clothes; his hip is stiff; in order to sit down he has to bend his knee back, he cannot stoop at all; she dressed him and put on his shoes this morning; she had to dress him ever since he came out of the hospital with the plaster cast.

The plaintiff swore that his hip was stiff; that he could not stoop to tie his shoes; that he could not stand on his hip long; that he was working at a drug store sweeping and dusting and could not do work as a laborer as before; he works from 8 to 6 P. M.; he walks to his work in the morning and walks back home, fourteen blocks each way.

Anderson King said that someone had to put plaintiff's pants on in the morning and thread his shoes on the left side; his left leg is stiff; he cannot do work of ordinary character; he cannot chop wood.

On behalf of the defendant two witnesses only were examined:

H. C. Cotham testified that for the last fifteen years he had been employed by the defendant company; for the last five years in the office; in that capacity he knew the plaintiff; the plaintiff earned $3.20 a day at the time of his fall and $1.50 after that time; from the time of his fall, September 20, 1920, until he left the employment of defendant in December, 1921, the mill worked 2773½ hours, of which the plaintiff worked 2300 hours, for which he was paid at the rate of 15 cents an hour, cr about $429.42.

J. P. Prescott was superintendent of assorting and drying for the defendants; he knew the plaintiff who worked for the defendants a couple of years previous to 1920; the time given to the plaintiff by the witness Cotham is correct; after his fall he saw the plaintiff engaged in pulling lumber on a few occasions; he complained of a stiffness in the leg; there was nothing that distinguished him from other laborers while he was working; he was capable of doing the work he was hired to do; he worked under him about fourteen months; compared with the average employee the employee the plaintiff made the same time.

There was judgment in favor of plaintiff for 60% of $3 per day, or $10.80 per week, from September 20, 1920, not exceeding 400 weeks, with interest on each weekly installment, subject to a credit of $367.36 and for $74.92 for medical expenses.

The defendant has appealed.

The evidence exonerates the plaintiff and his witnesses and "aides or instigators" from the charge of fraud, perjury and malingering so lavishly addressed to them by the defendant's counsel in his brief. While there may be contradiction and discrepancies in the testimony of some of plaintiff's witnesses we are justified in attributing them to the ignorance of country negroes and to errors on·their part rather than to intentional falsehoods. While the plaintiff has exaggerated the extent of his injuries, as is usually done in all cases of this kind, we believe that the fall suffered by him was the cause of all his trouble, that it produced in him a partial disability to do the work he was employed in at the time of his fall and a disability to do laborer's work. If he worked while in the employ of the defendants, it was because he had been advised so to do by the two physicians of the defendants in order to avoid permanent stiffness of the hip joint. These two physicians, Drs. Murphy and Parker, were not examined as witnesses upon the trial of this case. The presumption is their testimony would not have been favorable to the defendants. When the plaintiff's sufferings became so acute that he could not follow the treatment recommended by the doctors of the defendants, Murphy and Parker, he left them and consulted disinterested or better informed physicians, Drs. Donaldson and Pierce, and under their advice he proceeded to the Charity Hospital in the city of New Orleans.

Drs. Murphy and Parker admitted that the plaintiff was injured in his hip. But they told him he had rheumatism, syphilitic rheumatism or tubercular rheumatism. Drs. Simon and O'Ferrell deny that the plaintiff had rheumatism of any kind; having submitted the plaintiff to the Wasserman test, they found no trace of

venereal or tubercular infection. Further than this they both testified that the plaintiff was suffering from traumatic arthritis of the hip, produced by a blow; and they gave as their opinion that arthritis of the hip produced by venereal diseases had entirely different symptoms. They also gave as their opinion, which is sound in law as well as in medical science, that assuming that the plaintiff suffered a fall, the arthritis could be attributed to that fall alone, in the absence of any other probable cause. See the case of Rousseau vs. T. & P. Ry., 4 La. App. 691, and numerous cases there quoted.

Neither Dr. Murphy nor Dr. Parker was called to testify that plaintiff had not been affected by his fall.

When under the advice of Drs. Donaldson and Pierce, plaintiff repaired to the city of New Orleans; at the Charity Hospital he was advised at once that he was suffering from traumatic arthritis and treated accordingly. The only treatment to relieve his suffering was plaster casts; these were applied with the results intended. But the consequences, foreseen or not, brought on stiffness of the hip and leg, with all its infirmities; in other words, permanent partial disability; in consequence of which the plaintiff could no longer do the work he was engaged in prior to his fall, or any laborer's work.

Plaintiff is therefore entitled to the benefits of the Employers' Liability Acts. Act 247 of 1920, p. 467, governs this case. Section 8, Subsection (c), reads as follows:

"The injury producing partial disability to do work of any reasonable character, sixty per cent of difference between wages at the time of the injury and wages which the injured employee is able to earn thereafter during the period of disability, not, however, beyond three hundred weeks."

13 La. App.

At the time of the injury the plaintiff was earning $3.20 a day, or $19.10 a week; after the injury he continued to work at the mill, however irregularly, and received pay at the rate of $1.50 a day or $9 a week; the difference between the two is $10.20, 60% of which is $6.12.

He then went to New Orleans and on December 15, 1923, obtained work at a drugstore at $8.00 per week; the difference between the two is $11.20; 60% of which is $6.72.

It is therefore ordered that the judgment appealed from be amended by reading as follows:

It is now ordered that there be judgment condemning the defendants, the Lyon Lumber Company, to pay to the plaintiff, Eddie Wilson, the following amounts:

1st. The sum of six and 12-100 dollars per week from September 20, 1920, until December 15, 1923, with five per cent per annum interest on each weekly payment;

2nd. The further sum of six and 72-100 dollars per week from December 15, 1923, with five per cent per annum interest on each weekly payment during the period of disability not exceeding three hundred weeks;

3rd. The further sum of seventy-four and 92-100 dollars with five per cent per annum interest from December 1 1921, till paid;

The whole subject to be credited by four hundred and twenty-nine and 42-100 dollars as of date of December 31, 1921, by shortening the period of payments.

The defendants to pay costs of the District Court and the plaintiff the costs of appeal.

Judgment amended.